UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
UNITED MAGAZINE COMPANY, et al.,

                       Plaintiffs,                          00 Civ. 3367 (PKC)

      -against-

                                          MEMORANDUM
                                             AND
                                           ORDER

MURDOCH MAGAZINES DISTRIBUTION,
INC., et al.,
                           Defendants.
--------------------------------------------------------------x

P. KEVIN CASTEL, U.S.D.J.

          This is a Robinson-Patman Act claim brought by wholesalers of magazines against "distributors" of magazines. Familiarity is assumed with the prior decisions in this case, which set forth the plaintiffs' legal theories and the factual and procedural background of this case. United Magazine Co. v. Murdoch Magazines Distribution, Inc., 146 F.Supp.2d 385 (S.D.N.Y.2001) ("Unimag I"), United Magazine Co. v. Murdoch Magazines Distribution, Inc., 2001 WL 1607039 (S.D.N.Y. Dec.17, 2001) ("Unimag II") and United Magazines Co. v. Murdoch Magazines Distribution, Inc., 353 F. Supp. 2d 433 (S.D.N.Y. 2004) ("Unimag III"). A brief summary of the relationship of the parties and the nature of the claims is in order.

          The plaintiffs are United Magazine Company, The Stoll Companies, Michiana News Service, Inc., Geo. R. Klein News Co. and Central News Company (collectively, "Plaintiffs" or "Unimag") who are the wholesalers. The magazines at issue are "distributed" by defendants Kable News Company, Inc. ("Kable"), Murdoch Magazines Distribution, Inc. ("Murdoch Distribution"), TV Guide Distribution, Inc. ("TGD"), Curtis Circulation Company ("Curtis"), Comag Marketing Group, LLC ("Comag"), Hearst Distribution Group, Inc.

("HDG"), Time Distribution Services, Inc. ("TDS") and Warner Publisher Services, Inc. ("WPS") (collectively, "defendants" or "distributors").  Plaintiffs allege that, from May 1996 through May 2000, defendants violated the Robinson-Patman Act, 15 U.S.C. § 13(a), by providing "secret discounts, rebates, other payments, services of value and other benefits" to certain competitors of plaintiffs.  The facts describing the general relationship between the parties, including an overview of the magazine distribution system, are set forth in Unimag III, in which this court disposed of certain defendants' prior motions for partial summary judgment. In the main, and with the limitations and exceptions noted in Unimag III, the publishers of the magazines in question, and not the distributors, set the terms and conditions of sale.  Plaintiffs have not elected to sue the publishers.

Following nearly two years of discovery, defendants sought to file motions for summary judgment as to plaintiffs' remaining claims.  After a premotion conference at which the parties outlined on the record their claims and defenses, defendants proceeded with motions directed solely to the issue of whether section 2(a) of the Robinson-Patman Act applies to the transactions at issue in this case, reserving their right to move on other grounds at a later date if necessary.  On December 29, 2004, I granted partial summary judgment in favor of defendants.  In Unimag III, I concluded that there was no triable issue as to whether the moving defendants, other than Curtis, controlled the price and other terms of sale to plaintiffs.[1]  With respect to any claim based on defendants' return policies, I ruled that the moving defendants had not met their initial burden of demonstrating that their return policies cannot support a price discrimination claim against them under section 2(a).  Specifically, I ruled:

---

[1]    Defendant TDS sought summary judgment only with respect to magazines published by companies other than its parent company, Time Inc.  By the terms of its contract with Time Inc., TDS is the purchaser and reseller of those titles published by Time Inc.  My decision on the initial motion disposed of all claims against TDS other than those based on TDS's distribution of Time Inc. titles or TDS's allegedly discriminatory returns policy.  Kable was not a moving defendant.

"As to [the moving] defendants other than Curtis, plaintiffs' section 2(a) claims may proceed solely upon a claim that defendants' 'return policies' resulted in a discriminatory price or term of sale." <u>Unimag III</u>, 353 F. Supp. 2d at 448.  Subsequent to <u>Unimag III</u>, plaintiffs have endeavored to recharacterize the "return policies" claim as an "allotment" discrimination claim.

All defendants now move for summary judgment dismissing the remainder of plaintiffs' claim on several alternative grounds.  First, all defendants move for summary judgment on the ground that any alleged "allotment" discrimination asserted by plaintiffs is not actionable under the Robinson-Patman Act, and is, in any event, unsupported by evidence.  Second, Curtis, Kable and TDS (with respect to Time Inc. titles)—the only defendants against whom any claim based on price discrimination not arising from allegedly discriminatory return policies or allotments remains—move for summary judgment on the ground that no plaintiff can establish two essential elements:  causal antitrust injury and net price discrimination.  Third, defendant TDS moves on the ground that there is no proof that it discriminated in price with respect to Time Inc. titles.  Finally, defendants HDG and Comag move on the grounds that it is undisputed that HDG distributed magazines to plaintiffs during only a portion of the relevant time period, and Comag never distributed any magazine to any plaintiff at any time.  For the reasons set forth below, defendants' motions for summary judgment are granted, and plaintiffs' second amended complaint is dismissed.

Magazine Wholesaler Industry

Prior to 1996, magazine wholesalers such as plaintiffs operated in defined geographic territories, and, as a result, faced little competition from other wholesalers.  The lack of competition meant that wholesalers' margins were relatively high.  The lack of competition was not advantageous to retailers of magazines, however, and in 1995, retailers began to de-

mand a change in the industry. Large chain retailers shifted from purchasing magazines from many local wholesalers to purchasing from a limited number of wholesalers capable of servicing multiple, or even all, retail locations. The resulting consolidation of business led to direct competition between wholesalers for the first time. Chain retailers began inviting multiple wholesalers to bid for their business. The wholesalers did not generally know which other wholesalers were bidding for a retail account, or the prices or terms being offered by the other wholesalers. With the resulting competition came demands from large retail chains for larger discounts, as well as "signing bonuses" in exchange for signing multiyear contracts with a single wholesaler. (Unimag 1996 SEC Form 10-K (Bowman Ex. 12); Scherer Dep. at 44-45, 52-53, 57, 60-61; Declaration of Carol Kloster dated Feb. 8, 2004; Declaration of David B. Thompson dated June 14, 2005) In its Form 10-K for the year 1996, filed with the Securities and Exchange Commission, Unimag noted the significant "reduction in revenue from existing chain customers . . . where new discounts, rebates and amortization of signing bonuses caused an approximate 5% reduction in revenue without a corresponding reduction in the related cost of the products . . . ." Unimag noted that "[t]his trend was not unique to Unimag . . . as it was representative of changes throughout the entire industry in 1996." Unimag attributed its decline in gross margin "almost totally to the discounting and rebating changes during 1996." (Bowman Ex. 12 at 19) Unimag anticipated that it would be able to offset the decreasing margins and "greater pricing pressures" by reducing its fixed and variable costs, and noted that "successful wholesalers have concentrated on cost cutting measures in order to remain competitive." (Id. at 13, 15)

In the face of the dramatic changes and increased competition in the magazine wholesaling industry, many small wholesalers ceased conducting business, leaving only four major wholesalers and some 20 minor wholesalers. (Thompson Dep. at 92-93; Second

Amended Complaint ("2AC") ¶ 45)  The increased competition led to declining profitability for even the remaining wholesalers, including Unimag, who in some cases had to bid for business at unprofitable rates just to keep a retail account and keep market share.  (Scherer Dep. at 667)  At least one competing wholesaler, Charles Levy Circulating Company ("Levy"), stated that its strategy was to obtain and retain retail accounts regardless of profitability, meaning that the prices it paid for the magazines did not control the amount of its bids to sell the magazines.  (Kloster Decl. ¶ 9)

I.      DEFENDANTS' MOTION TO STRIKE

Defendants move to strike the Declaration of David B. Thompson in its entirety, along with certain exhibits to the Thompson Declaration.  Defendants also seek strike those portions of plaintiffs' Rule 56.1 statement that are identical to the Thompson Declaration or that rely on the exhibits sought to be stricken.

Defendants move to strike the Thompson Declaration as violating the requirements of Rule 56(e), Fed. R. Civ. P., that an affidavit in opposition to summary judgment must be made on personal knowledge and "set forth such facts as would be admissible in evidence" and that a party may not rest on "mere allegations or denials."  Defendants argue that the Thompson Declaration depends almost entirely on conclusory statements and inadmissible hearsay or evidence not in the record.  They also seek to strike the Declaration as contradicting the prior sworn testimony of Mr. Thompson and other Rule 30(b)(6) designees and contemporaneous documents, including filings with the SEC.  Generously resolving all doubts in favor of the non-movant, I conclude that the deficiencies in the text of Thompson Declaration do not go to its admissibility and, therefore, I will not strike the Declaration in its entirety.

However, the exhibits to the Thompson Declaration stand on a different footing.  Defendants seek to strike Exhibit GG to the Thompson Declaration on the ground that its

submission is precluded by prior order of this Court.  In my December 12, 2003 Order, I ruled

that the expert report submitted by plaintiffs on December 1, 2003, including the exhibits

thereto, "be treated as a nullity."  Plaintiffs now attempt to submit the very same exhibits in

opposition to summary judgment as Exhibit GG.  Plaintiffs argue that "the documents upon

which the Exhibit GG compilations were based . . . were not stricken merely because a compi-

lation was made of them and attached as an Exhibit to the stricken report."  Pl. Strike Mem. at

4.  While it is true that I did not strike the underlying information contained in the exhibits

(providing it had been produced prior to October 28, 2003), my December 12 Order was

clear:  "For the same reasons that the new expert report is treated as a nullity, <u>any exhibits</u> to

the December 1, 2003 submission that were not produced by October 28, 2003 <u>are stricken</u>."

Order of Dec. 12, 2003 at 7 n.3 (emphasis added); <u>see also</u> Pl. Strike Mem. at 3-4 (quoting

note 3).  Plaintiffs chose not to submit the "underlying documents" upon which Exhibit GG is

based in opposition to summary judgment; they chose to submit the compilations that com-

prise Exhibit GG.  Those compilations are the very exhibits that I ruled were stricken in my

December 12 Order.  Defendants' motion to strike Exhibit GG is granted.

Defendants also seek to strike a number of other exhibits to the Thompson

Declaration, including Exhibits B, D, F, G, H, I, N (pages 1-2), P, Q (pages 1-4), S, T and V

(pages 4, 7, 10-11), primarily as inadmissible hearsay.  They argue that plaintiffs have "pro-

vided no affidavits or witnesses to attest to the truthfulness or accuracy of these documents as

required by the Federal Rules of Evidence."  Def. Strike Mem. at 9.  They also move to strike

Exhibit S on the ground that it was not produced to defendants during discovery.[2]

---

[2]    With regard to Exhibit S, plaintiffs apparently claim that the fact that it was not produced to defendants dur-
ing discovery is excused because it was not called for by any of defendants' document requests.  (Pl. Strike
Mem. at 14)  Defendants contend they made "repeated requests" for the document. (Def. Strike Mem. at 7)
As with the remainder of the documents as to which plaintiffs invoke the "business records" exception to the

Plaintiffs argue that many of the documents in question (D, F, G, H, I, N (pgs. 1-2), Q (pgs. 1-4), T and V (pgs. 7, 10-11)) are Levy documents produced to defendants and admissible under the "business records" exception to the hearsay rule. Plaintiffs, however, offer no testimony or affidavit from a person with knowledge of Levy's business operations to lay a foundation that the documents are in fact business records. With respect to Exhibit P, plaintiffs describe the document as an "index to . . . Defendants' documents" that was "created by Plaintiffs summarizing data and documents obtained by Plaintiffs from Levy," and was produced in their October 28, 2003 submission to defendants. (Pl. Strike Mem. at 11) Plaintiffs contend that it is, or would be, admissible under Rule 1006, Fed. R. Evid., which provides that "[t]he contents of voluminous writings . . . which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation." While I am doubtful that Exhibit P would qualify as a summary or compilation under Rule 1006, I have nevertheless considered the document for whatever evidentiary value it may have, recognizing that it was created by plaintiffs and is merely an index with their characterization of documents that were, in large part, not submitted to the Court for consideration as part of the record. Plaintiffs provide absolutely no basis for concluding that page 4 of Exhibit V is admissible; plaintiffs describe it as "a note by Plaintiffs calling attention to the last page" of a deposition exhibit (Pl. Strike Mem. at 11). Although the admissibility of the exhibits that are the subject of defendants' motion to strike is doubtful, the Court has reviewed and considered all the exhibits in opposition to defendants' motion for summary judgment, and I decline to strike any exhibits other than Exhibit GG.

---

hearsay rule, discussed below, I decline to strike Exhibit S, and have reviewed it and considered it in opposition to defendants' motion, despite serious doubts as to its admissibility.

II.     SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation and quotation marks omitted); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). However, when the moving party has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e).

It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, demonstrating that it is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in its favor, as a matter of law. Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" as to a material fact. A fact is material if it "might affect the outcome of the suit under the governing law. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. Thus, in order to survive summary judgment, plain-

tiffs must come forth with more than a mere scintilla of evidence in support of their position;

they must come forward with evidence "on which the jury could reasonably find for the plain-

tiff." Id. at 252. "The non-moving party may not rely on mere conclusory allegations nor

speculation, but instead must offer some hard evidence showing that its version of the events

is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.), cert. de-

nied, 524 U.S. 911 (1998). In reviewing a motion for summary judgment, the court must

scrutinize the record, and grant or deny summary judgment as the record warrants. See Fed.

R. Civ. P. 56(c). In the absence of any genuine dispute over a material fact, summary judg-

ment is appropriate.

III.     PLAINTIFFS HAVE FAILED TO CREATE A TRIABLE ISSUE
         AS TO SO-CALLED "ALLOCATION DISCRIMINATION"

In opposing defendants' initial motion for summary judgment, plaintiffs prof-

fered an argument that the defendants controlled the "return policies" pursuant to which un-

sold magazines were returned to the publishers for a credit. Plaintiffs argued: "The return

policies were an important component of the prices paid by United Magazine . . . . To the ex-

tent that a distributor did not allow a credit for any returned magazines, United Magazine's

price per magazine increased." (Alfonsi Declaration ¶ 14)

At the time of my decision in Unimag III, plaintiffs' return policy claim had

not been well defined by plaintiffs. Viewing the matter generously – perhaps over generously

– to the non-movant, I concluded, on the record and argument that I then had before me, that

defendants had failed to meet their initial summary judgment burden with respect to the re-

turns issue. I stated:

> If plaintiffs can demonstrate through admissible evidence that the
> [return] policies were applied in a discriminatory fashion, that
> those policies affected the price paid by plaintiffs for magazines,
> that the price differences caused competitive injury, and that plain-
> tiffs have suffered antitrust injury caused by any discrimination,

then plaintiffs will have established an actionable violation.

Unimag III, 353 F. Supp. 2d at 448.  I concluded that "[a]s to defendants other than Curtis [and non-movant Kable], plaintiffs' section 2(a) claims may proceed solely upon a claim that defendants' 'return policies' resulted in a discriminatory price or term of sale." Id.

On February 23, 2005, in connection with an upcoming premotion conference, plaintiffs wrote to the Court and represented that their "returns" claim now involved "a handling policy favoring competitor Levy, in which Levy was allotted fewer magazines and had lower returns and reduced costs of operation as a result."  At a conference held on March 3, 2005, the Court asked plaintiffs to articulate the theory for their "returns" claim.  Counsel for plaintiffs responded that "the theory is that we were allocated more magazines to sell knowing how many were going to be sold so that we were getting a higher percentage of magazines that we had to return through our system, which means returns."  (March 3, 2005 Tr. at 24) When asked by the Court how that would lead to any injury if, for example, plaintiff was allocated 200 magazines and received $1 back for every magazine returned, and Levy received only 100 magazines but also received $1 back for every magazine returned, counsel for plaintiff articulated the following theory of recovery:  "They didn't pay us to distribute them. They didn't give us a penny for the magazines that were returned.  So we had to eat the total cost of laying the magazine out and returning it without having a sale." (Id. at 25)  Plaintiffs asserted that this theory was actionable under section 2(a).

Defendants assert that they are entitled to judgment as a matter of law with respect to plaintiffs' "return policy" claim now described as an "allocation" claim.  Defendants argue that discrimination in the quantity of products sold to a customer is not actionable under section 2(a) of the Robinson-Patman Act.  In addition, defendants have come forward with

admissible evidence demonstrating that even if plaintiffs' claim were actionable, no defendant discriminated in allocating products to plaintiffs and their competitors.

Each defendant has submitted an affidavit or declaration from a knowledgeable employee attesting to the fact that the defendant did not discriminate in the allocation of copies of the titles distributed to plaintiffs and Levy, and/or that the fact that wholesalers may have different "sell through" rates—that is, the proportion of magazines received by wholesalers that are in fact sold to retail customers—would not be attributable to differing allocations of product. See Aff't of Richard Jacobsen, 4/21/05 (TDS and WPS); Decl. of Klaus Gunn, 4/22/05 (Murdoch Distribution and TGD); Decl. of Robert A. Castardi, 4/21/05 (Curtis); Aff't of John E. DiFrisco, 4/21/05 (Comag and HDG); Decl. of William Zechman, 4/20/05 (Kable). In addition, the Murdoch Distribution/TGD and Curtis declarants have sworn that the respective publishers -- and not these defendants -- determined the quantity of magazines allocated to wholesalers. See Gunn Decl. ¶ 5; Castardi Decl. ¶ 5.

In response, plaintiffs do not attempt to refute defendants' showing that defendants did not discriminate in allocating copies of magazines to plaintiffs, or in the case of Murdoch Distribution and Curtis, that they were not responsible for such allocations. In the five sentences offered in opposition to this part of defendants' motion, plaintiffs assert (without citation to any evidence) that "the evidence shows that the favored buyer — Levy — was given assistance so that its labor would be less by handling fewer magazines on a percentage basis which resulted in substantial savings over what Plaintiffs were required to spend thereby increasing Plaintiffs' costs for the same magazine titles." (Pl. Opp. at 25-26) Plaintiffs' latest attempt to recast their claims fails to meet the standard set forth in Unimag III, which made clear that plaintiffs only remaining claim (as to most defendants) was one based on a theory that "defendants' 'return policies' resulted in a discriminatory price or term of sale to plain-

tiffs". I also note that plaintiffs' new theory shifts ground from the allotment theory articu-

lated at the March 3, 2005 conference.

Section 2(a) of the Robinson-Patman Act makes it unlawful for "any person

engaged in commerce, in the course of such commerce, either directly or indirectly, to dis-

criminate in price between different purchasers of commodities of like grade and quality,

where either or any of the purchases involved in such discrimination are in commerce . . . and

where the effect of such discrimination may be substantially to lessen competition or tend to

create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with

any person who either grants or knowingly receives the benefit of such discrimination, or with

customers of either of them." 15 U.S.C. § 13(a).

Plaintiffs' allotment and return policy theories, as more fully developed on this

motion, simply do not state a viable claim under section 2(a). It is price discrimination to

which section 2(a) is addressed. As the Tenth Circuit has succinctly noted:

> Section 2(a) is directed to price discrimination and nothing more.
> Price is to be determined by reference to the invoice submitted to
> the buyer, and any discounts, offsets, or allowances not reflected in
> the invoice price. . . . a violation of section 2(a) only arises when
> "discriminations in the terms of sale . . . permit the favored cus-
> tomers to purchase at a lower price than other customers, so that
> their only practical effect [is] to establish discriminations in price,
> precisely the evil at which the statue was aimed."

Black Gold, Ltd. v. Rockwool Industries, Inc., 729 F.2d 676, 682 (10th Cir.), cert. denied,

469 U.S. 854 (1984) (quoting Corn Prods. Ref. Co. v. FTC, 324 U.S. 726, 740 (1945); addi-

tional citation and internal quotations omitted). Courts have defined "price" under the Act as

the "'net price received by the seller from the two buyers in question.'" Amsterdam Tobacco

Inc. v. Philip Morris Inc., 107 F. Supp. 2d 210, 220-21 (S.D.N.Y. 2000) (quoting Conoco,

Inc. v. Inman Oil Co., 774 F.2d 895, 902 (8th Cir.1985)). The fact that a purchaser may in-

cur expenses not incurred by a competitor may increase the purchaser's costs, or reduce their profits, but it does not change the net price paid by either the purchaser or the competitor to the seller. Nor is plaintiffs' claim sustainable under any theory of "indirect" price discrimination. As the Court noted in <u>Amsterdam Tobacco</u>, "It is well established that the forms of 'indirect' price discrimination encompassed by the Robinson-Patman Act are limited to rebates, discounts, free goods, promotional payments, or similar <u>forms of compensation</u> that are given by the seller to the buyer and that, effectively, lower the price charged by the seller to the buyer (in comparison to other buyers)." 107 F. Supp. 2d at 221 (emphasis added) (citing <u>Conoco</u>, 774 F.2d at 901-02; <u>Black Gold</u>, 729 F.2d at 682). Here, the purported "assistance" given to Levy—on which plaintiffs offer no evidence—does not appear to be in the form of compensation; indeed, because plaintiffs have made no evidentiary proffer, it is impossible to know the form that this purported "assistance" took.

Even if plaintiffs had articulated a legally cognizable theory, they have failed to come forward with any evidence—as opposed to conclusory statements—in support of their new theory. Nowhere in plaintiffs' papers is there a citation to any evidence of labor assistance given to Levy to reduce its handling costs. In response to defendants' summary judgment motion, plaintiffs have failed to come forward with admissible evidence to support their dubious legal theory, and as such, plaintiffs have failed to demonstrate the existence of a material fact in dispute sufficient to defeat summary judgment. All defendants are entitled to summary judgment on any claim of alleged "allotment" discrimination or "return policy" discrimination.

Because plaintiffs have failed to create a genuine issue of material fact with respect to any claim based on a purported "allotment" discrimination or "return policy" dis-

crimination, the claims against defendants Murdoch Distribution, TGD, Comag, HDG and WPS are now dismissed in their entirety.

IV.    PLAINTIFFS HAVE FAILED TO CREATE A TRIABLE ISSUE AS TO CAUSAL ANTITRUST INJURY

The Robinson-Patman Act does not provide a private cause of action.  Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 218 (2d Cir. 2004).  Rather, plaintiffs' cause of action arises under section 4 of the Clayton Act, 15 U.S.C. § 15(a), which permits "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" to bring suit in federal district court.  15 U.S.C. § 15(a).  To bring suit under the Clayton Act, a private litigant seeking treble damages must show antitrust injury.  Blue Tree Hotels, 369 F.3d at 220.

The Supreme Court has made clear that the Robinson-Patman Act provides no "automatic damages."  Rather, a plaintiff must prove more than a violation of the Act, and "must make some showing of actual injury."  J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562 (1981).  Demonstrating that a plaintiff has suffered actual antitrust injury sufficient to invoke the Clayton Act is distinct from a showing of injury to competition in the relevant industry as a whole.  "While competitive injury concerns the potential effect certain conduct may have on competition generally or on the business opportunities of a defined class of competitors, the focus of 'antitrust injury' is on whether the challenged conduct has actually caused harm to the plaintiff."  Blue Tree Hotels, 369 F.3d at 220 (citations and internal quotations omitted); see also Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A. Inc., 354 F. Supp. 2d 293, 306 (S.D.N.Y. 2004); Intimate Bookshop, Inc. v. Barnes & Noble, Inc., 2003 WL 22251312, at *3 (S.D.N.Y. 2003); Indus. Burner Sys., Inc. v. Maxon Corp., 275 F. Supp. 2d 878, 889 (E.D. Mich. 2003) (plaintiff "must, if it is going to have standing to recover dam-

ages as a private plaintiff, demonstrate that it suffered actual injury to its business as a result of the price discrimination – the antitrust injury requirement”).

To establish an antitrust injury, a plaintiff must show (1) an injury in fact, (2) that was caused by the violation, and (3) that it is the type of injury contemplated by the statute.  J. Truett Payne, 451 U.S. at 562.  It is plaintiffs’ burden “to show a causal connection between the price discrimination in violation of the Act and the injury suffered.”  Perkins v. Standard Oil Co., 395 U.S. 642, 648 (1969).  In doing so, plaintiffs must show “some direct evidence” illustrating a causal link between discrimination and injury.  Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1273-74 (3d Cir. 1995) (emphasis in original), cert. denied, 516 U.S. 1172 (1996); Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 478 (S.D.N.Y. 2001) (to establish antitrust injury, “the harm must result from a competition-reducing aspect or effect of defendant’s behavior, and it must flow from conduct that the antitrust laws clearly condemn.”) (citations omitted).  Plaintiffs must show that the alleged discrimination—and not other factors—was the cause of the injury they allegedly suffered.  See United States Football League v. Nat’l Football League, 842 F.2d 1335, 1377-79 (2d Cir. 1988) (plaintiffs must demonstrate that defendants’ unlawful acts, and not other factors, substantially contributed to their injuries); Intimate Bookshop, 2003 WL 22251312, at *4-7 (granting summary judgment where plaintiff “provided no evidence, in any form, that defendants’ alleged violation of the Act, as opposed to other intervening market factors, was a material cause of its lost sales and profits”); see also Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir.), cert. denied, 531 U.S. 979 (2000) (expert opinion insufficient to sustain damages claim where it did not distinguish lawful from unlawful conduct).

In moving for summary judgment, defendants contend that plaintiffs have no evidence of any causal link between the alleged discriminatory pricing and any alleged injury.

They assert that there is no evidence or expert opinion supporting plaintiffs' "price erosion" theory of causation. Defendants point to testimony from plaintiffs' expert that he could not identify an instance in which Levy – the allegedly preferred wholesaler – and one of the plaintiffs were the only two bidders for a particular account. (See Einhorn Dep. at 211) Defendants also submitted testimony from plaintiffs' expert that, in order to show that plaintiffs' alleged "price erosion" was caused by Levy's allegedly favorable pricing, plaintiffs would need to show that plaintiffs won a bid for which Levy was the next lowest bidder, and that he was not provided with sufficient information to determine whether such a situation ever occurred. (Einhorn Dep. at 211-12, 222-23) I conclude that defendants have met their initial burden on this motion for summary judgment. If plaintiffs "fail[] to introduce substantial evidence showing that they were actually injured," summary judgment in favor of defendants is appropriate. Interstate Cigar Co. v. Sterling Drug Inc., 655 F.2d 29, 31 (2d Cir. 1981).

Although plaintiffs may not be required to set forth "'the kind of concrete, detailed proof of injury which is available in [non-antitrust] contexts,'" Hygrade Milk & Cream Co. v. Tropicana Prods., Inc., 1996 WL 257581, at *16 (S.D.N.Y. 1996) (quoting J. Truett Payne., 451 U.S. at 565) (alteration in original), they nevertheless must come forth with some evidence of actual injury, as opposed to evidence of an underlying violation. George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 145 (2d Cir. 1998). It is not enough for plaintiffs to demonstrate that they paid more for magazines than did their competitor, Levy. See World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1480 (10th Cir.), cert. denied, 474 U.S. 823 (1985). They must come forward with evidence that the alleged price discrimination by Curtis and Kable, and by TDS with respect to Time Inc. titles, had a detrimental effect on plaintiffs' business. Id. ("In view of the complete absence of record evidence that the alleged Robinson-Patman discrimination had any detrimental effect on World of

Sleep's ability to do business, its damage claim for this violation should not have gone to the jury.")  The mere perception of injury will not suffice, and abstract conclusions not adequately grounded in the facts of the case cannot create a triable issue of fact as to antitrust injury.  See Maddaloni, 354 F. Supp. 2d at 307-08.

On the record before me, plaintiffs have not raised a triable issue of fact as to whether they suffered antitrust injury.  Although antitrust injury – as opposed to the underlying discriminatory conduct – may be established through evidence of lost sales or profits, those lost sales or profits must be demonstrated to be a result of the alleged discrimination, in this case, alleged differences in pricing offered to plaintiffs and Levy.  See, e.g., Maddaloni, 354 F. Supp. 2d at 306-07; Intimate Bookshop, 2003 WL 22251312, at *3 ("[A] plaintiff who has proved a violation under Section 2(a) or 2(f) must still establish 'antitrust injury' through some evidence of actual injury, usually in the form of lost sales or profits, and a causal connection between the price discrimination and the actual damage suffered to support an award of damages.") (citation and internal quotation omitted).  While a showing of causation "may be made by proof that the illegal discrimination permitted a favored purchaser to lower its prices and thereby reduce a plaintiff's sales or profits," where a plaintiff presents  "no evidence that the allowance enabled favored competitors to lower their prices and divert sales, or that it had to lower its prices to an unprofitable level in response to such low prices," no antitrust injury is established.  World of Sleep, 756 F.2d at 1480.

Here, plaintiffs assert that they suffered antitrust injury because defendants' discriminatory pricing policy caused "price erosion," defined by plaintiffs as "decline of Plaintiffs' margins."  (Pl. 56.1 Resp. ¶ 25)  Plaintiffs specifically disavow any claim for damages based on having lost accounts to Levy prior to September 1999.  (Id.; Bowman Decl Ex. 25)  According to plaintiffs, the amount of their reduction in profit margin for the years 1996

through September 17, 1999 is "approximately equal to the amount of the discrimination which we calculated between the Defendants' price to Levy and the Defendants' price to Plaintiffs for the same magazines."  Thompson Decl., 6/14/05, ¶ 7F.  Plaintiffs' sole evidence in support of their price erosion theory consists of statements in the declaration of David Thompson, former Vice Chairman, Treasurer and CFO of United Magazine:

> Plaintiffs knew that Levy, its [sic] nearest competitor, had a presence in the market and was making an effort to sell its magazine wholesale services to some of plaintiffs' customers.  In most instances plaintiffs' customers would not tell plaintiffs the names of the other magazine wholesalers competing for the retailer's business, which meant that plaintiffs had to assume Levy was an actual or prospective competitor, requiring plaintiffs to meet what plaintiffs believed was Levy's price.  Levy's presence in the marketplace could not be disregarded by plaintiffs, especially since bidding was ordinarily done without knowing who else was bidding for the same customer.  (Thompson Decl. ¶ 5)

> Plaintiffs lowered their profit margins on all of their bids starting on January, 1996 [sic], approximately, to offset the market presence of Levy and Plaintiffs' estimate of the amount of Levy's discriminatory price advantage.  (Id. ¶ 7F)

> Because Levy was Unimag's nearest competitor, Unimag had to bid as if Levy was bidding or would become a bidder, to ensure that customers were not lost to Levy by failure to meet Levy's price.  Thus, Unimag's profit margins were not lower when Levy was a bidder; they were lower for all or most customers because of the realistic possibility that Levy would get the customer if Unimag did not meet Levy's actual or threatened bid.  (Id. ¶ 22)

Despite Mr. Thompson's attempt to create an ex post facto connection between Unimag's bidding practices and margins and Levy's alleged price advantage, plaintiffs' effort to demonstrate antitrust injury fails for a number of reasons.

First, the statements in the Thompson Declaration as to what plaintiffs knew with respect to the competitive bidding environment during the relevant time period are completely unsupported by any citation to any evidence compiled during the almost two years of discovery in this case.  As the Supreme Court has held, a self-serving affidavit that merely

reiterates conclusory allegations in affidavit form is insufficient to preclude summary judg-ment, and "it will not do to 'presume' the missing facts because without them the affidavits would not establish the injury that they generally allege." Lujan v. Nat'l Wildlife Found., 497 U.S. 871, 888-90 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); see also Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.") (citing Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)). The Supreme Court in Lujan further made clear that in the context of a summary judgment motion, unlike on a motion to dismiss under Rule 12(b), there is no presumption "that general allegations embrace those specific facts that are necessary to support the claim." 497 U.S. at 890 (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Plaintiffs have submit-ted no evidence from which a reasonable jury could conclude that plaintiffs were bidding and reducing their profit margins in response to Levy's presence in the market.

Second, and most significantly, the factual assertion in Mr. Thompson's decla-ration is contradicted not only by statements in plaintiffs' SEC Form 10-K for 1996, but by a Supplemental Declaration submitted by Mr. Thompson in opposition to defendants' motion to strike. In that Supplemental Declaration, dated August 4, 2005, Mr. Thompson states that in 1997:

> Plaintiffs' management believed that other wholesalers could not compete against Plaintiffs in Plaintiffs' territories because it would be unprofitable for them to do so unless the competitors had a lower price. Plaintiffs did not know [in 1997] that Levy had a lower price and Plaintiffs' management felt that companies such as Levy could not profitably compete in Plaintiffs' territories because they did not have a better price. Plaintiffs learned during discovery that Levy had a better price and calculated the extent of it. Thompson Supp. Decl. ¶ 6. (emphasis added)

It is axiomatic that a party cannot defeat summary judgment by submitting an affidavit that contradicts prior sworn deposition testimony. See, e.g., Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir.1995) ("'[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.'") (quoting Mack v. United States, 814 F.2d 120, 124 (2d Cir.1987); additional citation omitted). It should be equally clear that a party cannot defeat summary judgment by submitting flatly contradictory affidavits. Plaintiffs cannot assert both that "Plaintiffs lowered their profit margins on all of their bids starting on January, 1996 . . . to offset . . . Plaintiffs' estimate of the amount of Levy's discriminatory price advantage" (Thompson Decl. ¶ 7F) and that "Plaintiffs did not know [until 2003] that Levy had a lower price" (Thompson Supp. Decl. ¶ 6). Similarly, plaintiffs cannot assert that their injury was caused by having to meet the prices that, during the relevant time period, it believed its "nearest competitor" was bidding or would be bidding, and at the same time claim that, during the relevant time period, they believed that companies such as Levy could not and were not competing in the market. If Thompson's Supplemental Declaration and plaintiffs' Form 10-K for the year ending 1996 are true insofar as they assert that plaintiffs did not and could not face serious competition in their markets during the relevant time period, it cannot also be true that they lowered their margins and profits in response to that competition.

Third, defendants came forward with evidence demonstrating that the price erosion relied upon by plaintiffs was attributable to substantial unrelated factors that contributed to declining margins in the magazine wholesaling industry. (See Unimag 10K, Bowman Ex. 12 at 19; Decl. of Carol Kloster, dated February 8, 2004) Plaintiffs' own expert conceded the necessity of accounting for unrelated "relevant factors [leading to declining margins] on every account" in order to properly assess the affects of any alleged price discrimination.

(Einhorn Dep. at 221-23)  But plaintiffs have failed to account for these other causes of price erosion.  Plaintiffs' attempt in paragraph 7F of the Thompson Declaration to attribute all of their reduced margins to the alleged discriminatory pricing contradicts the Supplemental Thompson Declaration and common sense: given Thompson's acknowledgement that plaintiffs' profit margins were declining even in the absence of any knowledge that Levy was competing in their markets or receiving favorable pricing from any defendant, common sense dictates that any "price erosion" must have been the result of factors other than Levy's alleged price advantage.  There is no inference that could be drawn from the evidence that would permit a reasonable jury to conclude otherwise.  Cf. MCI Communications v. Am. Tel. & Tel. Co., 708 F.2d 1081, 1162 (7th Cir.), cert. denied, 464 U.S. 891 (1983) ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage.  This is precisely the type of speculation or guesswork not permitted for antitrust jury verdicts.") (citation and internal quotations omitted).

Plaintiffs have failed to raise a triable issue of fact as to the existence of antitrust injury caused by a violation of section 2(a).  The remaining claims against defendants Curtis, Kable and TDS therefore are dismissed.  I also adopt this basis as an alternative ground for granting summary judgment to defendants Murdoch Distribution, TGD, Comag, HDG and WPS.  I do not reach the other bases for summary judgment set forth in defendants' motions.

VI.    CONCLUSION

For the reasons set forth herein:

1.    Defendants' motions to strike are GRANTED in part and DENIED in part.

2. The motions of all defendants for summary judgment dismissing plain-
tiffs' Second Amended Complaint are GRANTED.

3. The Clerk is directed to enter judgment in favor of defendants.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
September 22, 2005